Ryans v. Hospes.

RYANS v. HOSPES, Administrator Pendente Lite, et al., Appellants.

**Division Two, March 11, 1902.**

1. **Services:** IMPLIED CONTRACT: WHEN INVOKED. In a suit by a body-servant for services rendered deceased, a witness testified that, in reply to an inquiry as to what he paid plaintiff, deceased had said he had "no special agreement with him; that he furnished him all that was necessary for his personal expenses, and was to set him up handsomely when he got through with him, and that a question of money would not be an inducement to part with his services." Plaintiff's services, which extended over nine years, were estimated by witnesses to be reasonably worth from $75 to $150 per month, and it was also shown that deceased gave plaintiff $400 with which to buy a tract of land on which his family dwelt and also $140 to buy a mule for their use. *Held*, that according to the statement of deceased there was no *express* agreement, and that the gift of land, being a gift, was not a fulfillment of the agreement to set plaintiff up "handsomely when he was through with him," and hence the law *implies* on the part of deceased a promise to pay the servant the reasonable value of his services.

2. ———: ———: VALUE: EXCESSIVE VERDICT. Deceased was a man of large wealth, entirely without family, and in his extreme old age was as helpless as a child, and was for nine or ten years attended by a faithful and honest negro servant with unremitting care and watchfulness. *Held*, that a verdict for $7,373.33 and interest from date of demand was not excessive.

3. ———: ———: PRESUMPTION OF PAYMENT. Deceased stated about two years before his death, in regard to the employment of a body-servant, who had then been for ten years in his service, that he had "no special agreement with him; that he furnished him all that was necessary for his personal expenses, and was to set him up handsomely when he got through with him." *Held*, that no presumption of payment can be invoked on appeal, for two reasons: first, no plea of

Ryans v. Hospes.

payment was made in the trial court, but on the contrary payment was expressly disclaimed; second, because deceased out of his own mouth removed any suspicion for plaintiff's delay in demanding a settlement.

4. **Interest:** CLAIMS PRESENTED TO ADMINISTRATOR PENDENTE LITE. The court should allow interest from the date of the presentation of an unliquidated demand to an administrator *pendente lite*, if he is the only representative of the estate to whom demands may be presented.

5. **Practice:** REMARKS OF COUNSEL: AFFIDAVITS. Affidavits are not the proper way of preserving for review remarks of counsel at the trial.

6. ———: ———: INTESTATE'S BOOKS. In an effort to rebut any presumption that plaintiff had been paid, his counsel referred to the fact that no books had been presented showing payment, and stated that the books were in the hands of the administrator, of which facts there had been no evidence. *Held*, that the presumption of law is that they were in his hands, and no error was committed by such argument.

7. **Amending Pleadings After "Rest:"** NO EVIDENCE: PAYMENT. Defendant offered no evidence of payment at the trial, but distinctly disclaimed any effort to prove payment. *Held*, that the court rightly denied his request to amend his answer after all the evidence was in.

8. **Witness:** TRAINED NURSE: VALET. A trained nurse is a competent witness to testify as to the value of the services of a body-servant in nursing his master.

Appeal from St. Louis City Circuit Court.—*Hon. P. R. Flitcraft*, Judge.

AFFIRMED.

*R. M. Nichols* for appellants.

(1) The court erred in not granting defendants' demurrer to the evidence, because plaintiff's evidence showed that Dr. Bradford was "to furnish plaintiff all that was necessary for his personal expenses, and was to set him up handsomely when he got through with him." The testimony further

showed that Dr. Bradford furnished Ryans with his personal expenses and purchased him a farm, and gave him money with which to buy mules and implements. The meagre proof of the services rendered would be referable to this agreement, in the face of which the law would not imply a contract. Suits v. Taylor, 20 Mo. App. 166; Mansur v. Murphy, 49 Mo. App. 267. (2) No book account was shown of the services claimed from July 10, 1889, to August 1, 1897. No demand was shown to have been made on the deceased in his lifetime. It was shown that the deceased was a wealthy man and that plaintiff was poor. The law will presume, from these circumstances, that the claim was paid as it accrued monthly, as stated in the petition. In the face of this testimony claimant must go further and show that this stale claim was never paid. Carpenter v. Hoys, 153 Pa. St. 432; Estate of Weaver, 182 Pa. St. 349; Coulstron's Estate, 161 Pa. St. 151; Kearney v. McKeon, 85 N. Y. 136; Rowland v. Howard, 75 Hun, 4; Hughes v. Davenport, 37 N. Y. 244; Edgerton's Exr. v. Edgerton, 17 N. J. Eq. 419; Harris v. Edwards' Exr., 17 Lanc. Law R. 223; Wood v. Land, 30 Mo. App. 176; Bean v. Fenucle, 94 N. Y. 382. (3) The mere making of the demand of Richard Hospes, administrator *pendente lite,* on September 2, 1898, of an unliquidated claim for $7,373.33, ought not to start the running of interest, for the reason that however willing Hospes may have been upon that date, and however able, to satisfy said claim out of the assets of the estate, he could not have legally done so until the claim had been legally proven, because there was no amount agreed upon as remuneration for the services rendered, the petition counting upon the reasonable value thereof, and therefore interest could not run against the estate until plaintiff did some act legally establishing his claim. It is not claimed that plaintiff exhibited his demand September 2, 1898, to the administrator for the purpose of having the same allowed. The statute does not intend to give interest on unliquidated accounts from

demand. RoBards v. Lamb, 89 Mo. 303; Wolff v. Matthews, 98 Mo. 246; Dozier v. Jerman, 30 Mo. 218; Pursell v. Fry, 19 Hun, 595; In re Merchant's Estate, 6 N. Y. S. 875; In re Greenawalt's Estate, 9 Lanc. Bar. 50. (4) The testimony introduced to prove the reasonable value of Wyatt Ryans' services was only the testimony of expert nurses, and the objection as to their competency should have been sustained for the reason that, as such experts, they were incompetent to testify as to the value of the services rendered by Wyatt Ryans as a valet. Weideman v. Thompson, 65 N. Y. S. 481. (5) A hiring at so much per week or month usually implies a promise to pay at the end of such period, and it will ordinarily be presumed, in the absence of evidence to the contrary, that the salaries of persons employed at a certain amount per month became due and were paid at the end of the month. Abbott's Trial Evidence, p. 367; In re Sheets Lumber Co., 52 La. 1337.

*W. B.* and *Ford W. Thompson* for respondent.

(1) The defense of a general denial, when coupled with an admission in open court, and an attempt to prove that these services were gratuitous is inconsistent with a defense of payment, and as between inconsistent defenses, defendant must elect. Defendants, having tried the case on the one theory, could not properly be permitted to amend, and try it upon the other. Nelson v. Broadhack, 44 Mo. 596; Fugate v. Pierce, 49 Mo. 499; Ledbetter v. Ledbetter, 88 Mo. 60. In this case, defendants have actually had the benefit, if not the right, to try the case, not only upon the pleadings, but also as though the amendment had been made, since they offered all the facts they have of payment, and argued to the jury upon these facts that the plaintiff had been paid—in fact, were permitted by the inferior court "to blow both hot and cold," and now in reality complain because they were not permitted to do it all

over again. (2) The verdict is well within the evidence offered by plaintiff, and there was no competent evidence offered to disprove either the performance or the value, except that of Boogher, and the jury certainly did not believe a single word that he said, and what he said was not competent. (3) There is not a single error in the record committed in plaintiff's favor; not one upon which even these defendants could be given the benefit of believing that this court would reverse the judgment, and they had the advantage of many errors to which plaintiff was compelled to submit. (4) In cases where an appeal is taken without merit, and where there is absolutely no prejudicial error, or any reasonable grounds for appeal, this court is prone to allow the penalty prescribed, and assess ten per cent damages for the delay and annoyance occasioned. Harwood v. Farramore, 50 Mo. 414.

GANTT, J.—This is an action at law, commenced on November 18, 1898, upon a *quantum meruit* for services rendered by plaintiff as the body-servant and nurse of Dr. Charles H. Bradford from July 10, 1889, to August 1, 1897, at $75 per month, eight years and one month...........$7,275.00
And from Aug. 10, 1897 to April 20, 1898, at $100

    per month ............................. 833.33

And credited with $735.00 paid on account......$8,108.33
Showing a balance due of $7,373.33.

The answer was a general denial.

On March 11, 1899, the jury rendered a verdict for plaintiff for $7,605.33, and from the judgment thereon defendant appeals.

Dr. Bradford died in the city of St. Louis on or about the twenty-first day of April, 1898, leaving a last will, which was admitted to probate, in which he appointed Jesse L. Boogher and Howard Blossom his executors. They accepted the trust and duly qualified about May 26, 1898. A contest

of said will was begun in the circuit court and thereafter on or about July 6, 1898, the said executors were removed and Richard Hospes was appointed administrator *pendente lite,* and qualified as such, and was in charge of said estate when this action was commenced.

Dr Bradford left an estate of the value of about $400,-000, of which there was $285,923.23 of personal estate.   He was seventy-eight years old at the time of his death.   It appears that he had no wife or children, but was married about the year 1886 to Mrs. Cochran of Eufaula, Alabama, from whom he was subsequently divorced in 1889 or 1890.   Mrs. Cochran was a sister of Tandy W. Toney, of Eufaula, who had resided in that city for more than forty years.   It was at his house that Dr. Bradford first met the plaintiff, Wyatt Ryans, who was a negro servant in Mr. Toney's family.   Prior to 1886 the plaintiff had spent three-fourths of his life in Mr. Toney's family as servant and nurse.   Having served Dr. Bradford on one of his visits to his brother-in-law, the doctor was so pleased with him that he asked Mr. Toney if he had any objections to his taking Wyatt away with him, and Mr. Toney assenting he employed the plaintiff, who served him as body-servant and nurse from that time more or less every year until the doctor's death in 1898.

The testimony of Mr. Tandy, on whose premises plaintiff's family continued to reside after he went into Dr. Bradford's employment, was that "Wyatt first went with the doctor in 1886 and for the first four years after 1886 he was with him from three to six months in the year   .   .   .   but that since then he had given up all of his business for Dr. Bradford and was subject to his orders until the latter died" in April, 1898.   The services charged for in this action begin July 10, 1889, and do not include the years prior thereto.

As to the continuity of his service and its acceptability to Dr. Bradford, and its arduous and exacting nature and value, it can best be told by the witnesses themselves.

Mr. Louis Harper testified he had been for ten years register clerk at the Southern Hotel. Had known Dr. Bradford for twenty years before his death; that for eight or nine years the doctor would spend several months at the Southern and during all that time was accompanied by Wyatt, the plaintiff, as his valet, who waited upon him exclusively; that the doctor was seventy-eight years old when he died, and had during his acquaintance with him been a delicate man and grew more and more so as he grew older until, the last time he was at the Southern, he had to be wheeled about in a chair. He was *finicky* about his wants and always demanded and got one of the most expensive rooms in the hotel for himself, and a room adjoining for Wyatt; that Wyatt's services were those that a servant should give, good, perfect attention, watching him at all times.

Dr. J. B. Coryell, a physician, testified he was called in April in consultation with Dr. Kier and found Dr. Bradford very feeble, perfectly helpless; could not take care of himself nor attend to the wants of nature; that Wyatt was present as nurse and body-servant; that he lifted the doctor around in bed, gave him his medicine and attended to all his wants. Had to attend to him as one would a little child with reference to his going to his stool, etc. Doctor Coryell testified he was familiar with the value of such services as he saw Wyatt performing for Dr. Bradford, and they were reasonably worth $150 a month.

Patrick Smith, a head waiter at the Southern Hotel for four and one-half years, and employed as a waiter about the hotel for twelve or thirteen years, said he had known Wyatt Ryans for about nine years and was sure it was over eight years, as a servant for Dr. Bradford, who was an old man, without family, and attended only by this colored servant, until towards the end of his life when a Mr. Chalmers was also with him. He was old and feeble, and needed some one with him all the time, almost always had his breakfast in bed, which

was ordered by Wyatt, and had to have Wyatt about with him about all the time; that Dr. Bradford had often spoken to him about Wyatt's faithfulness and the comfort it gave him; that the doctor would stay at the hotel two or three months and then go away again to the East and South. On cross-examination defendant showed that plaintiff had been with Dr. Bradford for eight or nine years; that prior to becoming head-waiter witness had been private waiter and attended to all upstairs service of meals, which brought him a great deal in contact with Wyatt; that he had seen Wyatt walking with him, and if the doctor would be sitting in his room with friends, Wyatt would be waiting to answer his wants; that he would meet him five or six times a day as his duties called him to that part of the house, and Wyatt was always present with the doctor, waiting on him and ready to execute orders; that during this time Wyatt had told witness that he traveled with the doctor and enjoyed going about with him from place to place; that the doctor had not been strong enough to be left alone and upon his own resources for a long time before he was confined to his bed during his last illness, and that often, prior to his last illness, he had been present in the doctor's room, arranging the table while Wyatt had him in an adjoining toilet room attending to him, and this he had noticed for perhaps two or three years before his death.

John J. Meyers, assistant head waiter at the Southern Hotel for thirteen years, knew Dr. Bradford and Wyatt well and stated that Wyatt had been coming there with the doctor for about nine years, acting as valet and body-servant to him; that they stayed two or three months in the year; that Dr. Bradford was a very weak man during the whole of that time and did not take his meals at all regularly in the dining-room; but would have to have them served in his room; that he would be confined to his room often for three or four days at a time. Witness had heard Dr. Bradford say that Wyatt was a very faithful man.

Dr. William F. Kier, a practicing physician for twenty-nine years, knew Dr. Bradford about nine years and had attended him during that period when he was in St. Louis. He stated that he met Wyatt when he met the doctor, and had known them both about the same time, nine years; that since October, 1897, when his last illness began, he had attended the doctor as physician continuously until his death. "That Dr. Bradford was a very infirm man at all times, a very weak man, and that Wyatt looked after him just like he would have to look after a child. . . . Ryans waited on the doctor, he was his body-servant; looked after him in a general sort of way; nursed him as you would a baby. . . . It was necessary for him to have a body-servant all the time that I knew him; at all times during the years that I knew Dr. Bradford it was necessary for him to have some one like a servant around him, and with him all the time. . . . He was a weak, feeble old man as long as I knew him." Witness stated he saw Wyatt performing the services that the doctor required; "that means that he lifted him into and out of his bed, put him on his chair and off his chair, and cleaned him when it was necessary, as he would have had to do with a baby. Well, Wyatt simply took the same kind of care of the doctor in the matter of looking after him and cleaning him up when his bowels moved, and the doctor had no control over them and he was in that condition all the time; and he had to assist him when he had to pass his water, and holding his vessel and removing him, gave him his sponge bath, washed his face and combed his head, and looked after him in every way as a child had to be looked after." That he never saw the doctor either at his (Dr. Kier's) office, or in Dr. Bradford's room at the hotel as long as he knew him that Wyatt was not present, and he saw him during about nine years; that he had often had chats with the doctor about his travels when Wyatt was present, and the doctor told him that Wyatt went with him and waited upon him wherever he went on his travels. The witness stated

that he was familiar with the value of such services as Wyatt performed during the period covered by the time when he was called to attend Dr. Bradford in his last illness from October, 1897, down to the time of his death; that they were worth $5 per day; that would be a very reasonable charge; that during that period Wyatt attended him day and night and was with him every time he called to see him; that he had noticed the manner in which he performed the services that the doctor's condition demanded; that he was an excellent servant and well qualified. On cross-examination defendants showed that Dr. Kier had never charged Dr. Bradford for any services up to the period beginning in October, 1897, because they were both physicians; that Wyatt frequently came to him to take the doctor away.

John Cahill, a waiter at the Southern Hotel for nine or ten years, knew Dr. Bradford and waited upon him; had often carried meals to the doctor's rooom and knew Wyatt, and at such times saw Wyatt handling the doctor, picking him up, putting him on his chair, taking him back and setting him in bed again; that Wyatt was always around attending to his wants every time he entered his room, and that was for about five or six years; he was always with the doctor; that the doctor would often say that he and Wyatt were about to go away together, either South or to San Francisco; he was a very delicate old man, not regular at meals and often complained of his ill-health.

Ada Morris, a nurse for seven years, knew Dr. Bradford since the fall of 1897 and helped nurse him from November 7, 1897, until April 2, 1898; at that time Ryans was there in attendance upon the doctor also; there was also another nurse, Miss Shaw, and Miss Church, during this period; that during the time she was there "Wyatt did all the things that were necessary for a sick person to have done and for any one that was helpless;" that Wyatt was tired out with being up so much night and day; that Dr. Bradford told her while she was there

with him that Wyatt had been with him a long time, and that
he was a very faithful old servant; *had been with him twelve
or thirteen years;* that often at night the doctor would talk to
her when he was lying awake. . . . . During the time that I
was there with the doctor I was on night duty and Wyatt was
on day duty, but at any time during the night that I called
him Wyatt was there, too. · Wyatt slept in the room with Dr.
Bradford when I went there, and Dr. Bradford was helpless
and ill in bed. When I went there Mr. and Mrs. Alfred
Bradford were present, and they introduced me to Dr. Brad-
ford and Wyatt, and told me that Wyatt would show me what
to do for the doctor; that he had been with Dr. Bradford for
a number of years, or a long time, and this was said in Dr.
Bradford's presence as I was introduced to him."

Witness said that she was familiar with the value in St.
Louis of such services as she saw Wyatt Ryans perform; that a
trained nurse stays on duty only twelve hours, but is subject
to call for eighteen hours, and she is paid $3 per day, and that
a day nurse also receives $3 per day and is subject to a call
eighteen hours, making $6 per twenty-four hours paid the two
nurses for twenty-four hours' attendance of the sick and such
services as Wyatt performed; that Wyatt was subject to call,
*and was called for twenty four hours.*

Miss Shaw, a professional nurse of five years' experience,
knew Dr. Bradford since November, 1897, and attended him
for six days in November and again from April 2, 1898, to his
death; that when she came there in November, Wyatt was not
there but was at home with his sick wife and he was gone six
days. I was called in during his absence and when he re-
turned I left and returned April 2nd to 20th. Dr. Bradford
always spoke very kindly of Wyatt and appreciated his atten-
tion. Wyatt paid every attention to the doctor that it was
necessary to give to a sick person. I stayed until Dr. Bradford
died, and during that time I was on at night and Wyatt was
on in the day, and whenever the doctor wanted Wyatt in the

night I called him, sometimes five or six times in the night. Dr. Bradford was very weak and feeble when I saw him first in November, but much worse in April. Wyatt and Mr. Chalmers were there when the doctor died.

Chalmers was a nephew of Dr. Bradford. He testified at great length to the valuable services of Wyatt to his uncle. He first met the doctor at Lake Minnetonka in 1894, where the doctor spent four or five weeks. Wyatt was not with him then. The doctor spoke of his colored servant whom he had given a vacation of three weeks to visit his family in Alabama and although he had been gone only a few days he was sorry he had let him go as he said he could not get along without him; that he had not been away that long for sometime and his nephew persuaded him to let him serve him during Wyatt's vacation. After three weeks the doctor telegraphed Wyatt to join him which he did. Dr. Bradford told his nephew about Wyatt. Said he was a perfect servant and invaluable to him, most faithful, and had been in his employment seven or eight years. Wyatt came and he and the doctor left for New York. He next saw them in the spring of 1895, at Southern Hotel in St. Louis. Wyatt was still serving him. Doctor Bradford said to witness, "Wyatt was worth his weight in gold and there wasn't another man on earth that could take his place." The doctor told him Wyatt had been with him all the time since he saw them at Minnetonka. In the fall of 1895, Dr. Bradford sent for witness to come to New York. Wyatt was there but the doctor said Wyatt was sick and he would have to let him go home. He stayed with his uncle and Wyatt went home and was gone two months and a half and upon a telegram returned to the doctor at St. Louis. The doctor was worse. · Had no control of his lower bowels. Wyatt waited on him and washed him like he was a baby. He had occasion to notice his condition at intervals down to his death, and it continued as in

Vol 167 mo—23

1895. In 1896 the doctor gave Wyatt two weeks' vacation, and sent him home; paid his fare down and back.

On cross-examination he stated he had loaned Wyatt $500, but it was not money given him by Doctor Bradford to give Wyatt. He stated he did not draw $2,500 on a check by Dr. Bradford, but when shown a check for that sum stated he had received that money, but he had not given any part of it to Wyatt or received it for him. This witness stated that Dr. Bradford had given Wyatt a small farm, a barren stretch of land near Eufaula, that cost $400 and also gave him $140 to pay for a mule and some farm implements. Wyatt had been notified by the people who owned the place on which his family resided that thereafter they would have to pay rent and the doctor to spite these people whom he knew and disliked very much, gave Wyatt the money to buy his little place and the mule, and gave him drafts to pay for them. They were presents by the doctor to Wyatt. Witness wrote them at the doctor's request. Wyatt Ryans was in no way related to Dr. Bradford. Mr. Toney testified Dr. Bradford on several occasions told him that Wyatt's services were valuable to him, and he would rather have him than anybody he could get; that his services were invaluable.

J. G. Guice of Eufaula, testified he had been a banker in that city for thirty-three years. Had known Dr. Bradford for twenty years or more; that the last time Dr. Bradford was in Eufaula he was very feeble and required the services of a strong, able nurse all the time; that Wyatt is honest and industrious, and stands as high as any colored man he knew; that he had been in Dr. Bradford's employ for a very long time, continuously, or almost continuously; that his general health was good, but that he had been sick at times. "Dr. Bradford, in speaking of Wyatt in my presence, and addressing his remarks to my inquiries, said he is the most faithful and valued servant and nurse of any man he could get in the United States, and he did not see how he could get along without him;"

and to a question as to what he paid him, Dr. Bradford said he had no special agreement; that he furnished him all that was necessary for his personal expenses, and was to set him up handsomely when he got through with him, and a question of money would not be an inducement to part with his services. "I talked with him on the street and at his home, and the doctor being an affable talker, was often thrown with him and was much interested in his conversation." Witness further stated that he had no interest either in Dr. Bradford's or Wyatt's affairs.

On the part of the defendant, one of the executors, Mr. Boogher, was called to testify to certain statements made by Wyatt, when his desposition was being taken in the will contest, to the effect that Dr. Bradford had given him the $400 farm and the $140 for the mule and implements; that the checks produced were sent him to pay his railroad fare to Narragansett Pier and to St. Louis and other places; that the little farm, etc., were *gifts;* that $25 was what he paid certain servants at a hospital of which he was an officer, but they did not render services like those rendered Dr. Bradford by Wyatt. He testified the estate was worth $400,000, $110,000 of which was cash.

Upon this evidence the court overruled demurrer to the evidence and gave the following instructions at the request of plaintiff.

1. "The jury are instructed that if they find from the evidence that the plaintiff, Wyatt Ryans, at the instance and request of the deceased, Dr. Charles H. Bradford, performed services as nurse and body-servant for said Dr. Bradford, from the tenth day of July, 1889, down to the date of his death, to-wit, the twenty-first day of April, 1898, then plaintiff is entitled to recover in this action what the jury believe from the evidence was the reasonable value of such services, not to exceed the sum of $8,108.33, less the amounts received by plaintiff during said times, to-wit, the sum of $735, as alleged in

plaintiff's petition, together with interest thereon from the twenty-first day of September, 1898, if they find from the evidence that on said date the said claim was presented to the defendant, Richard Hospes, as administrator *pendente lite* of the estate of Charles H. Bradford; unless you find for the defendant under instruction numbered 4, given herewith.

2.    "In determining the value of the plaintiff's services in this case, if they find for the plaintiff, the jury should consider all the facts and circumstances in the case, and what they believe from the evidence is a fair and reasonable sum to be paid for such services.

3. .    "The jury are instructed that they are the sole judges of the credibility of the witnesses, and of the weight to be given their testimony, and if they believe that any witness has willfully testified falsely as to any material matter in issue, they should disregard such false testimony, and may disregard the whole of his testimony."

To the giving of which instructions, and each of them, counsel for defendant then and there excepted at the time.

At the request of the defendant, the court gave the following instruction to the jury:

4.    "If, from all the facts and circumstances detailed in evidence in this cause, you believe that plaintiff did not intend to charge for his services rendered to deceased, or if from such evidence and circumstances you believe that such services were rendered in consideration of certain gifts, if any, made to plaintiff by deceased, then your verdict must be for defendants."

The court, of its own motion, also gave the following instruction to the jury:

5.    "The court further instructs you that if you find for the plaintiff, you will compute interest on such sum as you may find to be due the plaintiff at the rate of six per cent per annum, from the second day of September, 1898, down to the present time, which interest, if any, you will add to such sum

as you may so find under the evidence is due the plaintiff, thereby rendering your verdict in a lump sum."

To the giving of which instruction the defendant excepted at the time.

I.   It is insisted in oral argument and brief by counsel for defendant that the circuit court erred in not directing a verdict for defendant because Mr. Guice, one of the plaintiff's witnesses, testified that on one occasion when Dr. Bradford was in Eufaula, in response to a question by Mr. Guice as to what he paid Wyatt for his services, which he had so highly lauded, Dr. Bradford answered that *"he had no special agreement with him; that he furnished him all that was necessary for his personal expenses, and was to set him up handsomely when he got through with him,* and a question of money would not be an inducement to part with his services," and because the testimony further proved that Dr. Bradford had furnished plaintiff with his personal expenses and had given him the $400 tract of land and the $140 to buy a mule and some implements, this was a performance of that agreement and the law would not imply a promise to pay plaintiff for his services. To sustain this proposition counsel rely upon the familiar principle that the law will not *imply* a promise when there is an express promise, and cite cases to that effect.   Counsel overlook the statement of Dr. Bradford that he had no *special* or *express agreement* with plaintiff as to what he would pay him for his services, and plaintiff's mouth is closed by the death of Dr. Bradford.   It is true that the doctor also said that *he furnished plaintiff with his necessary expenses,* which he certainly did not regard as a proper compensation, because he further said he "was to set him up *handsomely when he got through with him,"* and thus postponing the remuneration to a time when he should no longer need his services.

This is a misapplication by defendant of a correct statement of the law.   According to the statement of the deceased there was no *express* contract or agreement and, hence, there

is no reason why plaintiff should not invoke the promise which the law implies on the part of the employer to pay the reasonable value of the employee's services which have been rendered, to and accepted by him.

The evidence does not admit of a doubt that Dr. Bradford employed the plaintiff to serve him as his body-servant and nurse, and that for at least twelve years he rendered him the most efficient and satisfactory service, and that according to Dr. Bradford there was no express or special agreement as to what he would pay him therefor. Neither can it be maintained, with any plausibility, that the two gifts of $400, and $140, respectively, to pay for the little home, and a mule and some farm implements, refer to that "handsome compensation" with which the doctor in his own mind purposed to reward his faithful valet and nurse. All the evidence without contradiction shows that these two gifts were pure gratuities, without reference to payment for services, and according to his nephew they were made as much to gratify the spleen of the old gentleman against the people who had for many years furnished plaintiff's wife a home without rent, but were then demanding rent. The disproportion between the services rendered and the gifts forbid that a gentleman of Dr. Bradford's wealth and of his oft expressed partiality for plaintiff and his recognition at all times of the invaluable character of his services could have intended them as a fulfillment of his promise to Mr. Guice to set plaintiff up handsomely. Moreover, they were not given at the time which he had fixed for himself to reward plaintiff, to-wit, "when he got through with his services," but were made in the summer of 1896.

It is perfectly plain that the court committed no error in overruling the demurrer to the evidence based upon such a contention.

II.    It is next insisted that the verdict is excessive, because counsel argue, the services were so meagre, and because

this negro servant did not keep a book account thereof, and because the law will presume they were paid.

The testimony as to the services and the length of time they were rendered leaves no doubt whatever.

It came from the most disinterested sources and was corroborated in the most convincing manner. It was shown that as early as 1886, the plaintiff left his old home in Eufaula and his family, for the first four years devoted from three to six months every year traveling and waiting on Dr. Bradford; that he had by that time become so indispensable to his employer that from that time on until the doctor's death he served him *all the time,* barring the short vacations which the doctor gave him when he was sick. This is the testimony of Mr. Toney, in whose family plaintiff had been a family servant and nurse. And while it is true Mr. Toney did not travel with Dr. Bradford to see that plaintiff was at all times with him, the testimony of Mr. Harper, the register clerk of the Southern Hotel in St. Louis, and of Dr. Kier and of the head waiters of that hotel and of Dr. Bradford's nephew, all shows that for eight or nine years prior to Dr. Bradford's death in April, 1898, the plaintiff was the constant companion of Dr. Bradford not only in St. Louis, but in New York, Narragansett Pier, Hot Springs and California. The effort to reduce the time during which he worked for and nursed the doctor is futile in the face of the testimony of these disinterested witnesses, whose evidence convinced the jury and trial judge, and bears upon its face the impress of truthfulness.

Nor is the testimony as to their value less convincing or satisfactory. Indeed we do not understand counsel to seriously assail the charge for the last eight months' service, during which time Dr. Bradford was a helpless old man, unable to perform for himself the most ordinary duties in caring for his person.

The plaintiff was required to lift him day and night from and to his bed and in the language of both Drs. Kier and Cor-

yell "to care for him as one would for a baby," and such was the character of his service that during all those years and especially the last trying eight months that not a complaint was ever heard by Dr. Bradford, but on the contrary constant expressions of gratification as to Wyatt's faithfulness and deftness in ministering to his necessities, saying again and again that "not another man in the United States could do for him as plaintiff did."

During that time Drs. Kier and Coryell, and Miss Shaw and Miss Morris, all of whom saw and observed the services rendered by plaintiff, and all of whom knew the value of such services, testified that they were worth from five to six dollars a day or $150 a month, those months. And Christopher Schawacker, who had resided for forty years in St. Louis and for five years had been connected with the Odd Fellows Relief Association, in which capacity it was his duty to take care of all the sick members of that order that came to the city, hire physicians and nurses for them, testified that he knew the value of such services to a feeble old man like Dr. Bradford was shown to be, and that for nursing him day and night it was worth $5 to $6 per day, and that for such services as the testimony showed Wyatt rendered in the years previous to the last six months of the doctor's life, three dollars a day was reasonable, with his board and expenses paid.

James Aitken, a professional nurse since 1884 in St. Louis corroborated Mr. Schawacker and the physicians and nurses who attended Dr. Bradford in his last illness, in every respect.

The defendant offered no evidence that plaintiff's services were of less value or tending to show that they were not rendered for the full time for which he charged. While the verdict would be large for such services rendered a person of ordinary means, it must be borne in mind that Dr. Bradford was a man of great wealth; that he had no family to bear a portion of the burden of nursing him in his afflicted old age,

and when all these things be considered a charge of less than one thousand dollars a year for such care as his age and condition required, is not so excessive as to justify this court in declaring the verdict was the result of passion or prejudice.

The jury doubtless considered that what was reasonable for a man of Dr. Bradford's wealth and infirmities might not be so for one who was not able to purchase for himself such care and service. We see no reason for interfering with the verdict on this ground.

But it is said there is a presumption that plaintiff was paid because Dr. Bradford was a very wealthy man and there was no reason why he should not have paid plaintiff from time to time and thus prevented so large a claim.

No such presumption was invoked in the trial court. No plea of payment was made, but on the contrary when defendant insisted on proving the two gifts of the little home and the mule and implements and it was objected that there was no defense of payment, counsel for defendant expressly disclaimed that they desired thereby to prove payment, but offered it to show that plaintiff rendered his services as a gratuity with no intention of charging therefor. Counsel cite a number of cases, especially from Pennsylvania, in which the courts have required the plainest proof of the rendition of the services in cases like this, and have deemed it incredible in the circumstances of some of them that a nurse would permit a bill to run when the employer was able to pay and the nurse was dependent on his or her wages for a livelihood. But we are not called upon to indulge such a presumption in this case, first, because no such question was presented to the trial court, and, secondly, because in this case out of Dr. Bradford's own mouth it is shown that he was defraying Wyatt's personal and traveling expenses, and therefore Wyatt did not need his wages for his support, and the evidence disclosed that his family consisted of a wife and a married daughter and there was no evidence that they were dependent on his monthly

wages.  If necessary we might indulge the presumption that his wife was a bread-winner herself, as most of her race are, and was fortunate in that she was not called upon to support her husband, as too many of her race are.

But Dr. Bradford removed any ground of suspicion growing out of the delay in demanding a settlement.  The jury were warranted in finding that the doctor held out as an incentive for good and faithful service, "a handsome remuneration at the end," when it should no longer be required.  He and Wyatt were competent to make their own agreements and if the doctor saw fit to defer the final adjustment, and Wyatt with his hope of something substantial was willing to trust him and wait, no one else could complain.

Presumptions are only to be indulged when the facts are not known.  Here the facts rebut any presumption of payment that might in their absence arise.

When plaintiff closed, he had made a prima facie case and it was for defendant, if he could, to show the services were not rendered, or were gratuitous or had been paid for.

But the idea that this negro man should leave his old home and family and serve Dr. Bradford, a gentleman of princely fortune, for twelve or thirteen years, as a pure gratuity, was doubtless too large a draft on the jury's credulity, as it certainly is upon ours.  Men of little or no means, dependent upon their own exertions for a livelihood, do not generally give the best years of their lives to the service of the rich and powerful gratuitously.  Common experience and reason, in addition to the evidence to the contrary, unite in rejecting such an inference from the facts developed in this case.

In our opinion there was no evidence upon which to base the instruction (4) given at the instance of defendant, but it was error of the defendant's own invitation and creation, and of course he can not be heard to complain.

III.  The third proposition advanced is that the court

erred in directing the jury that if they found for plaintiff they would, in addition to the sum they found due him, allow interest thereon at the rate of six per cent per annum from September 2, 1898, the date the demand of plaintiff was made of the administrator *pendente lite*.

For the purpose of allowance of demands the administrator *pendente lite* was the only representative of the estate to whom demands could be presented. We are cited by counsel to RoBards v. Lamb, 89 Mo. 303, and Wolff v. Matthews, 98 Mo. 246. The last mentioned case merely decides, so far as this question was involved, that to authorize interest a demand must be made, but that service of process was a demand for the purpose of starting the running of interest, and is opposed to defendant's proposition that interest could not run until the claim was legally established. The Lamb case does not touch the point under consideration.

The language of the statute is that "creditors shall be allowed to receive interest at the rate of six per cent per annum, when no other rate shall be agreed upon . . . . on accounts after they become due and demand of payment is made." [Sec. 3705, R. S. 1899.] . No question is raised as to the form of the demand and the only point urged is that because the administrator *pendente lite* could not pay it prior to its allowance, therefore interest is not allowable. We think the circuit court correctly interpreted the statute as allowing interest from the date of the demand made on the administrator on whatever sum was found due. [Dempsey v. Schawacker, 140 Mo. 680.]

IV. Certain remarks of one of plaintiff's counsel in the argument are assigned as ground for reversal. So far as these appear in the affidavits filed, they are not before us. We have uniformly ruled that this is not the proper way of preserving such extraneous matter. [State v. Carter, 98 Mo. 176; State v. Green, 117 Mo. 298; State v. Jackson, 126 Mo. 521.]

There is a statement copied in the record in regard to these statements, which, taken with the certificate of the judge, perhaps must be regarded as a part of the bill of exceptions, but it is doubtful on account of its want of identification.

Treating it as a part of the record it clearly shows that the first objection of defendant was promptly sustained by the court, and the jury told that there was no such evidence. In regard to the inquiry of counsel in his argument, "Have you had a single book, or memorandum from Dr. Bradford's effects indicating that any such payment had been made? Remember, we haven't these books in our possession. They are within the possession of these executors or this administrator *pendente lite*." To which counsel for defendant excepted: "There are no books."

. The Court: "You can not assume where the books are. There is no evidence bearing on the books."

Certainly this was a direct indication to the jury that the argument was not legitimate, but we do not think this was unfair argument. The statement was merely to the effect that no memoranda or books had been offered showing payment as contended by defendant and reminding the jury that if there were such they would be in the hands of the administrator. It was and is a fair presumption that whatever books or papers Dr. Bradford had kept or left were in the hands of his legal representatives. The law makes them the proper custodians and the real point of the argument was that presumably there were none showing payment, or they would have been produced. We are clear this argument furnishes no ground for a reversal.

V. · Another assignment is that the court improperly refused to let defendant, after the close of all the evidence, amend his answer by setting up a plea of payment. The defendant had offered no evidence of payment and when offering evidence of the gifts of the doctor to plaintiff, the plaintiff had objected that there was no plea of payment, whereupon

counsel for defendant expressly disclaimed any effort to prove payment, but stated they simply offered it on their theory that services were a gratuity for which plaintiff never intended to charge. Certainly the amendment then was not for the purpose of conforming to the proof as none had been offered and there was no offer of any additional evidence of payment, and there was no surprise. We think the court properly refused the amendment in the circumstances. If the services were gratuitous as the defendant claimed they were. and obtained an instruction on that theory, defendant's testator was not and could not be required to pay for them and that was the theory on which the defendant tried the case.

VI. It is also said that the court erred in permitting the expert nurses who assisted in nursing Dr. Bradford and who saw the nature of the services rendered by the plaintiff to state the value of his services for the reason that as such experts they could not testify to his services as a *valet*. As no such objection and exception was taken and saved it is not reviewable here, but it is without merit. A trained nurse ought certainly to know and recognize the value of another's nursing. Other witnesses, however, testified to the same facts without the slightest objection. There was no evidence of a hiring by the month or any stated period, and, hence, as already said, there was no ground for a presumption that plaintiff was paid monthly.

We have examined the record, and all the exceptions, and in our opinion the verdict and judgment was for the right party.

Services as meritorious as those shown in this case deserve to be paid for "handsomely." And such, we think, was the intention of the testator. There was no proof that they had been, and the court and jury properly awarded the recompense.

The judgment is affirmed. *Sherwood, P. J.,* and *Burgess, J.,* concur.