J. Robert MINOR, Administrator With Will Annexed of the Estate of Nellie Prentice, Deceased, Plaintiff,

v.

Elizabeth D. LILLARD, Administratrix of the Estate of Nellie Ellison, Deceased, Defendant.

No. 45144.

Supreme Court of Missouri.
Division No. 2.

March 12, 1956.

Motion for Rehearing or to Transfer to Court en Banc Denied April 9, 1956.

Henderson & Boulwar, Shelbina, Earl L. Veatch, Monticello, for appellant.

Bollow, Crist & Oswald, Shelbina, J. Andy Zenge, Jr., Canton, for respondent.

BARRETT, Commissioner.

This action originated when Mrs. Nellie Prentice, now represented by her administrator, filed a demand in the Probate Court of Lewis County against the estate of Miss Nellie Ellison. The Probate Court of Lewis County and the Circuit Court of Shelby County, upon change of venue, allowed the demand in the total sum claimed, $7,157.60, together with six per cent interest from the date of the allowance in the probate court, May 17, 1954. Upon this appeal by Miss Ellison's administratrix, the demand having been tried by the court without a jury, it is the duty of this court, with deference to the opportunity of the trial court to judge of the credibility of the witnesses, to "review the case upon both the law and the evidence as in suits of an equitable nature", V.A.M.S. § 510.310, subd. 4 and, if possible, "give such judgment as such court ought to have given, as to the appellate court shall seem agreeable to law." V.A.M.S. § 512.160; Wells v. Goff, 361 Mo. 1188, 239 S.W.2d 301. And in this connection, rejected testimony, if in the record and admissible, will be considered upon the review and any incompetent testimony admitted or considered by the trial court will be disregarded. Middelton v. Reece, Mo., 236 S.W.2d 335, 341; Boggess v. Cunningham's Estate, Mo.App., 207 S.W.2d 814, 817–818.

For the purpose of scrutiny and careful analysis in connection with the evidence and the essential merits of the plaintiff's claim and because of the alleged insufficiency of the statement it is necessary to set forth with some emphasis the essence of the demand. The principal allegations of the demand are contained in a single sentence: "For services rendered to Nellie Ellison from December 26th, 1945 * * * including the following: Taking Nellie Ellison to the hospital and clinic for examination and treatments; *arranging for* appointments with doctors, beauticians and *seeing that* the said Nellie Ellison was taken to fill said appointments; transacting business for the said Nellie Ellison including paying of bills, shopping, *having* her income tax returns prepared and *seeing that* same

were properly filed; *arranging for* a place for Nellie Ellison to stay and *checking to see* that she was receiving the care and attention she desired; carrying meals to her when the hotel grill was closed or when she was unable to go to the dining room for her meals; furnishing a home for the decedent during the months of June, July, August and September, 1947, during which time the hotel was out of operation due to high water; *seeing* that Nellie Ellison was given her medicine, bathed, waited on and cared for when she was bedfast; *looked after* moving Nellie Ellison's personal effects from the hotel and returning them when she was again able to return to the hotel; removing Nellie Ellison and her personal effects from the hotel on February 17th, 1951, when the hotel was threatened by a fire and keeping the said Nellie Ellison in claimant's home for four (4) weeks thereafter; waiting upon and administering medicine and food to Nellie Ellison during said time, bathing and caring for her; removing Nellie Ellison from the hotel to claimant's home for eight weeks in 1951 during which time the hotel was out of operation because of high water and during this time the claimant fed, bathed, administered medicine to and took care of Nellie Ellison; *supervised and assisted* in returning the deceased and her personal effects to the hotel when the place was again in operation; removing the deceased from the hotel on April 23, 1952 to the home of claimant where Nellie Ellison was kept until her death on May 16th, 1952 during which time claimant cared for and administered to the said Nellie Ellison in addition to *obtaining* other individuals to stay with the said Nellie Ellison a part of the time, * * *." It is then alleged that *"all of the above services were continuous from the date of December 26th, 1945 to the death of Nellie Ellison * * *."* The claim is thereafter itemized in this manner: "the fair and reasonable value for the services rendered for Nellie Ellison for sixty-nine (69) months at Seventy-Five Dollars ($75.00) per month, $5,175.00. The fair and reasonable value for seven and two-thirds (7⅔) months at Two Hundred Seventy-Five Dollars a month, $1,925.00. For *making arrange-* ments for the funeral, selecting the casket, etc., $50.00. May 16th, 1952, Call to Jefferson City, Mo., for decedent, $1.25. May 17th, 1952, Call to Jefferson City, Mo., $2.03. Call to Hannibal, Missouri, $1.02. Call to St. Louis, Missouri, $3.30. Total $7,157.-60."

As a demand against an estate, or the statement of a claim upon which relief could be granted in a demand, this one may be rather unique but it does state "the amount and nature of his claim", V.A.M.S. § 464.030, and is sufficient for the purpose for which it was originally intended, the legal exhibition of a demand against an estate. V.A.M.S. § 464.010; Britian v. Fender, 116 Mo.App. 93, 92 S.W. 179; Joseph v. Joseph, Mo.App., 164 S.W.2d 145. There is no specific allegation or claim that the services were rendered at the special instance and request of Miss Ellison but it is a fair and reasonable inference from the statement that the services were not gratuitously rendered; there was no family relationship, certain services were rendered and accepted in circumstances from which it is a reasonable inference that they were to be paid for. Patrick v. Crank, Mo.App., 110 S.W.2d 381, 384–385; Wells v. Goff, supra. While not artistically stated in legal terminology, the claim in fact states a cause of action in assumpsit or, in more modern terminology, restitution—a quasi-contractual obligation based upon unjust enrichment. Murphy v. Pfeifer, Mo.App., 105 S.W.2d 39; In re Hukreda's Estate, Mo., 172 S.W.2d 824; Nibler v. Coltrane, Mo., 275 S.W.2d 270, 273–274; Vosburg v. Smith, Mo.App., 272 S.W.2d 297. While the claim, in a generic sense, may be analogous to an action upon an account, as for the purpose of determining when interest is due and payable "on accounts after they become due and demand of payment is made", V.A.M.S. § 408.020; Coleman v. Kansas City, 351 Mo. 254, 173 S.W.2d 572, 576; Laughlin v. Boatmen's Nat. Bank of St. Louis, 354 Mo. 467, 189 S.W.2d 974, 978, it is, as stated, precisely what it in terms purports to be, an action to recover the reasonable value of services upon the basic theory of unjust enrichment.

We are not concerned here with the applicability of the interest statute, there was no claim for interest in the demand. There was no account, neither Mrs. Prentice nor Miss Ellison kept an account or for that matter any record or writing, and the fact of the plaintiff's setting forth the items in her demand does not alter the essential nature of the claim. Poague v. Mallory, 208 Mo.App. 395, 235 S.W. 491. Miss Ellison's administratrix offered in evidence two checks to Mrs. Prentice, one dated May 19, 1951 in the sum of $100 "for room and board" and a second check for $100 dated February 24, 1951, but upon objection by plaintiff's counsel they were excluded until it was shown "that they were used for some payment that is on that demand."

Considering, first, the demand itself. It is plainly alleged that *"all of the above services were continuous from the date of December 26th, 1945 to the death of Nellie Ellison."* When the claim is broken down in the demand it is for sixty-nine months at $75 per month and seven and two-thirds months at $275 per month. In point of time the claim covers every day from December 26, 1945 to the date of Miss Ellison's death, six years, four months and twenty-one days later. From a monetary standpoint there is a claim for every day of that period of time and even beyond Miss Ellison's death. In setting forth the demand we have italicized the words "arranging for," "seeing that," "having," "checking to see," "looked after," "obtaining" and "supervised." This is not to say that these words in their context carry the connotation of services for which compensation may not be had, however, they are not words describing the actual, personal performance of menial tasks or services. In the demand there are seven instances in which it is specifically alleged that Mrs. Prentice personally performed certain acts and services for Miss Ellison, as "transacting business," "carrying meals to her," "furnishing a home," "removing Nellie Ellison and her personal effects," "waiting upon and administering medicine," "fed, bathed, administered medicine" and "removing the deceased from the hotel on April 23, 1952." It is also noteworthy, while the demand alleges continuous serv-

ice, that it excerpts from the total period specified dates and attributes to them special significance, "furnishing a home for the decedent during the months of June, July, August and September, 1947," removing Miss Ellison from the hotel and keeping her in claimant's home for four weeks following "February 17th, 1951," and again "for eight weeks in 1951" and, finally, removing and keeping her in claimant's home from "April 23, 1952 * * * until her death on May 16th." It is assumed that these excerpted dates account for the itemized claim of $275 a month for the period of seven and two-thirds months.

In general the proof followed the statements set forth in the demand, and, it may be added, under the basic theory of the claim, shows that Miss Ellison's estate is liable in some sum to the estate of Mrs. Prentice for services performed, but the amount of the sum justly due is the essence of this appeal. The basis, origin and background of the relationship between Miss Ellison and Mrs. Prentice is not made to appear; it was only established that they were not related by either blood or marriage. All we know is that Miss Ellison, whose residence was Canton, Missouri, was in a hospital in Quincy, Illinois, in December 1945 with a broken hip. While in the hospital Miss Ellison was attended by doctors and special nurses as well as by the regular hospital staff. According to Mr. Prentice she was in the hospital from December 1945 until April 1946. Mr. and Mrs. Prentice were then living in Quincy and Mr. Prentice testified that beginning with the night of December 26th Mrs. Prentice called to see Miss Ellison and thereafter called once or twice a day throughout her stay in the hospital. He said, when his wife called, that she straightened her bed, massaged her leg and would "try to console her and fix her hair and any little thing that would make her comfortable." In April 1946 the Prentices changed their residence to Canton and when Miss Ellison left the hospital to return to Canton Mrs. Prentice "made the arrangements" for the ambulance in which she was transported. Mr. Prentice helped move Miss Ellison from the ambulance to

her first floor room in the Canton Hotel. Mrs. Prentice made her comfortable in her bed, massaged her leg, and thenceforward stopped to see her once or twice a day. From April 3, 1946 until the latter part of August Miss Ellison had the attendance of a practical nurse from ten o'clock at night until one o'clock next day. The nurse bathed her, gave her alcohol rubs, combed her hair and carried her meals to her and on Mondays when the hotel grill was closed fixed or procured her meals. In the beginning Miss Ellison was able to get into a chair, with assistance, and in a short time used a "walker" and was able to get from her room to the hotel grill without assistance and, for a time, dispensed with a nurse. At subsequent intervals, however, she had other practical nurses. Nevertheless, Mrs. Prentice called on Miss Ellison once or twice a day, sometimes running errands, taking her to the hairdresser, calling the doctor, arranging for people to stay with her, pushing her walker into the grill and, when the grill was closed on Mondays, bringing food to her. A few months prior to Miss Ellison's death Mrs. Prentice was empowered to write checks on her account and paid her bills. Mr. Prentice's testimony was corroborated by that of the doctors, the hotelkeeper and Mrs. Prentice's sister. One of the doctors said, "Nellie Prentice rendered services there that * * * I don't think you could buy—it would be pretty hard to buy, just ordinarily—it was more than just taking care of her."

Then there were the four special occasions of the flood in June 1947, the fire next door in February 1951, the June 1951 flood and the threatened flood and Miss Ellison's last illness beginning in April 1952. In June 1947 the Prentices were living in an apartment with the Taylors but they kept Miss Ellison there and Mrs. Prentice carried meals to her, bathed her and nursed her. On this occasion Miss Ellison paid the Taylors for her board and Mrs. Prentice testified that there was no claim on any of these occasions for furnishing food. But on this first occasion, in July, the Prentices moved into their own apartment and kept Miss Ellison until October, a period of four months. After the fire

next door to the hotel in February 1951 the Prentices gave up their own bedroom to Miss Ellison for a period of four weeks and with the second flood in June 1951 she was with them for two months and on this occasion, in addition to the other usual personal services, Mrs. Prentice prepared and served her meals. On the last occasion, from April until Miss Ellison's death on May 16th, Mrs. Prentice "made arrangements" for and someone did take care of Miss Ellison in the Prentice apartment, Mrs. Prentice assisting by fixing her hair, carrying meals to her and making her comfortable. In conclusion Mr. Prentice testified:

"Q. Claud, did you ever hear any conversation between your wife, Nelle Prentice, and Miss Nellie Ellison with reference to any kind of remuneration or payment to your wife for the services she rendered? A. I have.

"Q. Tell the Court about that. A. Miss Nellie said that in case anything ever happened to her, she wished my wife to make out a bill and present it against her estate.

"Q. Did your wife make any response to that? A. She said, 'That I will do.'

"Q. Did you hear that said on more than one occasion—a conversation of that nature? A. I have."

It is not necessary to analyze these detailed circumstances and consider the possible inferences and their essential meaning; it is sufficient to say, as indicated, that the proof followed, in general, the statement in the demand and, except for a factor now to be noted, would support the court's allowance of the total amount of the claim. That factor was indisputably established upon the cross-examination of Mr. Prentice. He was being examined as to the various apartments they had lived in and defense counsel inquired, "and then where did you move to? A. We moved to LaGrange. I don't just remember when we did move down there. It was, I imagine, I was managing the store at LaGrange for Nieman's. *I had a chance to get a*

*house down there, and we moved,* I think it was in the fall, late fall or early spring —early spring, I guess it was—*we moved down there and was down there just about a year* and we moved back and bought the store. Q. When you moved to LaGrange, you lived in LaGrange until you moved back and bought the store? A. Yes. *I don't guess it was quite a year."* Thus, summarily translating all the detailed circumstances into the legal problem presented, we have a claim for services rendered over an extended period of time, six years, four months and twenty-one days, under an arrangement which fixes no particular term of employment and no time for compensation. Miss Ellison's statement that "she wished my wife to make out a bill and present it against her estate" may show that the services were not considered as being gratuitously received and indicates an intention that some compensation was contemplated, but it is not the theory of this claim that there was an express contract and the statement, standing alone without terms as to pay or service, does not prove a contract. Broz v. Broz, Mo.App., 132 S.W.2d 1039. Thus in this action to enforce a quasi-contractual obligation based upon unjust enrichment the problem is whether the arrangement, or even contract, for services over the extended period of time, was a single, entire, continuous employment. If so the claim is not affected by the statute of limitations, but if it was not single and continuous so much of the claim as falls within the five-year statute of limitations is, of course, barred and is not recoverable in this action. Annotation 7 A.L.R.2d 198.

■ It is of the essence of a claim for services rendered over an extended period of time, under either an express or implied contract which does not fix the terms of employment or the time when compensation shall be paid, that the services must have been *continuous,* and this essential is required even in those cases decided upon the fiction and analogy of an open, current account between the parties. 7 A.L.R.2d loc. cit. 214–215. In Warren v. Davis, Mo.App., 97 S.W.2d 159, 164, it is stated that "A re-

covery has been permitted for services covering a period up to 40 years, even though there was a hiatus or intermission of services in some of the cases for periods of time up to more than one year." But an examination of the cases cited in that opinion involving claims for services, Kleinberg v. Kinealy, Mo.App., 193 S.W. 981; Smarr v. Smarr's Estate, Mo.App., 283 S.W. 461; Elstroth v. Karrenbrock, Mo.App., 285 S.W. 525, reveals that the services were in fact continuously rendered, except for the period of one week out of eighteen years in the Elstroth case, and the fact and necessity of continuity of the service has been emphasized even when an account has been found. Smith v. Collins, Mo.App., 243 S.W. 219; Smith v. Collins, Mo.App., 247 S.W. 457; O'Shaughnessy v. Brownlee, 229 Mo.App. 342, 77 S.W.2d 867. In the unique case of Ryans v. Hospes, 167 Mo. 342, 67 S.W. 285, there was some intermittency in the service but even so the arrangement was in fact entire if not continuous. But in all the cases, where it has appeared that the services were not continuous or that the arrangement or contract was not single or entire, recovery of compensation for services performed within a period falling within the statute of limitations has been denied. For example, in Ertel v. Warren, 157 Mo.App. 592, 138 S.W. 694, 695, the claim was for services rendered from February 6, 1889 to August 1, 1909, under an express agreement to pay. The court said, "The cause will have to be reversed, because of the error of the court in refusing to instruct the jury that plaintiff was not entitled to recover for services rendered prior to the 1st day of June, 1903. That part of plaintiff's demand was barred by the statute of limitations. In February, 1903, she left defendant's employ without any intention of ever returning, and when she did return after an absence of three months the evidence shows, if it shows any employment whatever, that the terms were different from what they were at the beginning. The second employment in any event constituted a new contract. Consequently the claim for services rendered under the former cannot be tacked onto the later con-

tract, so as to constitute a running account, and thus defeat the bar of the statute of limitations." The testimony of Mr. Prentice that he managed a store in LaGrange, that "I had a chance to get a house down there, and we moved, * * * moved down there and was down there about a year," establishes conclusively that there was a period of one year that they did not live in Canton. It is not made to appear just what year it was that they lived in LaGrange and there is no specific testimony that Mrs. Prentice did not perform any services for Miss Ellison during that year but neither, it may be added, is there any testimony that she did perform any services for her during that year—the fair and reasonable inference from the record and the halting explanation is that she did not. Also it may be noted, as it was in the Ertel case, that the itemized statement claims one sum for services for a period of sixty-nine months and another and much larger sum for a period of seven and two-thirds months so, whatever the terms of the employment may have been at one time or period they were something else at another. In any event, the fair and reasonable inference from Mr. Prentice's testimony is that his wife's services were not *continuous* and, therefore, some part of the claim is barred by the five-year statute of limitations. V.A.M.S. § 516.120; annotation 7 A.L.R.2d 198; Ertel v. Warren, supra; Thomas v. Fitzgerald's Estate, Mo.App., 297 S.W. 425, 429; Poague v. Mallory, 208 Mo.App. 395, 235 S.W. 491; Brunnert v. Boeckmann's Estate, Mo.App., 258 S.W. 768. It is not possible upon this record, in view of the indefiniteness of the evidence, to separate the recoverable items from the nonrecoverable items, Brunnert v. Boeckmann's Estate, Mo.App., 258 S.W. loc. cit. 772, as it was in the Ertel case, consequently it is not possible for this court to enter a judgment for the precise sum justly due.

■ In connection with the principal claim it should be noted that the fifty dollar item, "for making arrangements for the funeral, selecting the casket, etc.," and the claim for the telephone calls, all after Miss Ellison's death, may be allowable against the estate for some other reason but they certainly are not properly within the theory of this action that they were personal services rendered at the special instance and request of Miss Ellison. Hewett v. Bronson, 5 Daly, N.Y., 1.

For the reasons indicated the judgment is reversed and the cause remanded.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.